**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-4786**

_____

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

KEVIN MARQUETTE BELLINGER,

             Defendant - Appellant.

_____

Appeal from the United States District Court for the Northern
District of West Virginia, at Clarksburg. Irene M. Keeley,
District Judge. (1:12-cr-00100-IMK-JSK-2)

_____

Argued: December 10, 2015          Decided: June 13, 2016

_____

Before AGEE, FLOYD, and THACKER, Circuit Judges.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**ARGUED**: Linn Richard Walker, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Clarksburg, West Virginia; Mary Elizabeth Davis, DAVIS
& DAVIS, Washington, D.C., for Appellant. Andrew R. Cogar,
OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia,
for Appellee. **ON BRIEF**: Kristen M. Leddy, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Clarksburg, West Virginia; Christopher M.
Davis, DAVIS & DAVIS, Washington, D.C., for Appellant. William
J. Ihlenfeld, II, United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After a jury trial, Kevin Bellinger ("Appellant") was found guilty of murder by a prisoner serving a life sentence, in violation of 18 U.S.C. §§ 1111(a), 1118, and 2, and second degree murder, in violation of 18 U.S.C. §§ 1111(a)-(b), 2, and 7(3). He was sentenced to life imprisonment.

Appellant now challenges those convictions on appeal, arguing the district court erred by excluding certain testimony relating to the victim's violent history and by refusing to give a proposed jury instruction on imperfect self-defense. We find no error in the jury instructions given at trial. But we agree that the testimony in question should not have been excluded. It was relevant, non-cumulative, non-hearsay, and raised little potential for prejudice. And because we cannot say the evidentiary errors were harmless, we vacate Appellant's convictions and remand to the district court.

I.

A.

Appellant has been incarcerated at the United States Penitentiary Hazelton ("USP Hazelton") in Bruceton Mills, West Virginia, since 2006. He was assigned there while serving a 15-year-to-life sentence for assault with intent to kill while armed, and a consecutive five-to-15-year sentence for related firearm offenses arising out of the same incident. Both

2

sentences were imposed by the Superior Court of the District of Columbia in 2002.

The present appeal stems from Appellant's dealings with two friends he met growing up in Washington, D.C., and with whom he reconnected when all three were incarcerated at USP Hazelton: Patrick Andrews ("Andrews") and Jesse Harris ("Harris"). Appellant and Andrews were close. In fact, Appellant considered the two of them to be like brothers. They remained close friends during their time in prison. Appellant and Harris grew up in different neighborhoods, but they played football together and hung out together prior to their respective incarcerations.

On the evening of October 7, 2007, the three friends got into a fight. As all three were leaving the prison's outdoor recreation area, Appellant saw Andrews and a man known as "Black Junior" suddenly begin running into a housing unit. Harris was trailing just behind. At trial, Appellant testified that since he knew all three of the men, he "wanted to make sure . . . that everything was all right with them," J.A. 935,[1] so he followed them.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Appellant located Harris and Andrews inside the housing unit at the intersection of two prison corridors. The men seemed agitated. Gerald Osborne ("Osborne"), an eyewitness to part of the altercation, heard yelling and screaming as he approached the scene. Appellant claims he thought Harris was threatening to kill Andrews. Appellant testified that he heard Harris threaten to "stick . . . steel" in Andrews, J.A. 952, and that the statement was accompanied by aggressive body language that he believed indicated an imminent fight. Appellant -- and Osborne -- noticed Harris grab at his pocket during this posturing. Appellant interpreted that to mean that Harris had a shank or some similar weapon that could be used to carry out his threat. The situation quickly escalated into a full blown fight, with Appellant and Andrews teaming up against Harris. Appellant was armed with his own shank, and he repeatedly stabbed Harris. Harris ultimately suffered 22 stab wounds, which resulted in his death.

B.

Appellant and Andrews were indicted in the United States District Court for the Northern District of West Virginia on October 2, 2012. Both defendants were charged with one count of murder by a federal prisoner serving a life sentence, in violation of 18 U.S.C. §§ 1111(a), 1118, and 2, and one count of second degree murder, in violation of 18 U.S.C. §§ 1111(a)-(b),

4

2, and 7(3).  The district court severed the two co-defendants'
trials, and jury selection for Appellant's trial began on June
9, 2014.

The Government's case consisted of 14 witnesses over
two days.  The defense put on two witnesses: Osborne and
Appellant.  Both the prosecution and the defense showed the jury
video from the prison's security cameras, which had captured
parts of the fight and various surrounding events.

During the trial, the district court made three
rulings that Appellant challenges on appeal.  First, the court
excluded a portion of Osborne's testimony.  Osborne testified
that he "walked right through" the October 7 fight that resulted
in Harris's death.  J.A. 884.  He told the jury some of what he
saw and heard while the fight was happening.  However, the
Government objected when Appellant asked Osborne whether, prior
to the fight, "anyone ma[de] any threats toward anyone."  Id. at
889.  Appellant was trying to elicit testimony that Osborne
heard Harris say "he was going to slam a knife in somebody" just
before the fight became physical.  Id. at 897.  The district
court sustained the Government's objection, ruling Osborne's
response would be inadmissible hearsay.

Second, Appellant challenges the district court's
exclusion of his own testimony about his knowledge of specific
past acts of violence perpetrated by Harris.  Appellant

5

attempted to testify that he knew of the murder conviction that resulted in Harris's incarceration and that he also knew of a January 2007 incident at USP Hazelton, during which Harris apparently attempted to stab another inmate. The Government objected to the testimony pursuant to Federal Rule of Evidence 403, and the district court sustained the objections, ruling that the proposed testimony was unfairly prejudicial and therefore inadmissible. The court permitted Appellant to "go into the general background" of his knowledge that Harris was a dangerous individual but ruled that he could not "go into the specifics." J.A. 959.

Third, Appellant challenges the district court's refusal to give his requested jury instruction on imperfect self-defense. "An imperfect self-defense involves the defendant's unreasonable use of deadly force to thwart an assault. . . . The defense does not exonerate the defendant of culpability for a homicide, but justifies only a manslaughter conviction." United States v. Milk, 447 F.3d 593, 599 (8th Cir. 2006). It is an argument, in other words, that though a defendant killed his victim, he "d[id] not have the requisite mens rea to be guilty of second-degree murder" -- malice aforethought. Id.

Imperfect self-defense can take different forms, but here, Appellant wanted to instruct the jury that, if he

6

possessed an "actual, though unreasonable, belief" that Andrews "was in immediate and imminent danger of death or serious bodily harm," he should be found "guilty of voluntary manslaughter rather than murder." J.A. 226. The district court saw no need to spell out Appellant's theory of defense in such detail. It rejected the proposed instruction and observed that imperfect self-defense simply "leads . . . to an instruction on voluntary manslaughter," which was already included in the jury instructions. Id. at 870.

Appellant's jury was thus instructed that it could find Appellant guilty of voluntary manslaughter, but not second degree murder, if it found that the Government failed to prove malice aforethought. And the jury was instructed that Appellant should be found not guilty if his use of force was a legally justified defense of Andrews, meaning (among other things) that no reasonable alternative method of preventing harm to Andrews was available. But the jury was never expressly instructed that voluntary manslaughter was the appropriate verdict if Appellant's decision to use deadly force was based on an "actual, though unreasonable, belief" that such force was necessary to save Andrews's life. J.A. 226.

## C.

Throughout his trial, Appellant never disputed that he was one of the individuals who stabbed Harris. Rather, his

7

defense rested solely on his state of mind. Appellant argued that he acted in defense of Andrews and in the heat of passion. Both arguments relied in part on Appellant's contention that, in the prelude to the fight, Harris verbally threatened to stab Andrews while aggressively grabbing at his pocket in a manner that Appellant interpreted as indicating that Harris was carrying a weapon. Under those circumstances, Appellant argued, it was reasonable to react as though Harris had a shank and intended to use it. And even if his belief that deadly force was necessary to save Andrews's life was unreasonable, Appellant argued that hearing death threats lobbed at his longtime friend aroused such blinding anger that his ensuing actions must be understood as taken in the heat of passion.

After just one hour and fifteen minutes of deliberation, the jury rejected both defenses and found Appellant guilty of both charged counts. The district court subsequently entered a final judgment of conviction and sentenced Appellant to two concurrent life sentences to run consecutive to the sentences he was already serving.

Appellant filed a timely appeal.

II.

A.

We begin by addressing whether the district court committed reversible error by excluding Osborne's testimony that

8

Harris threatened "to slam a knife in somebody," J.A. 897, immediately prior to Appellant's October 7, 2007 fight with Harris.

"We review a district court's refusal to admit evidence under an abuse of discretion standard. A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." United States v. Henry, 673 F.3d 285, 291 (4th Cir. 2012) (citations omitted). "Evidentiary rulings," moreover, "are subject to harmless error review, such that any error is harmless where we may say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" United States v. Cone, 714 F.3d 197, 219 (4th Cir. 2013) (quoting United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010)).

1.

The Government concedes that excluding Osborne's testimony as hearsay was error, and it is correct to do so.

A statement is "not hearsay" if it is "not offered to prove the truth of the matter asserted," but rather, is offered "as circumstantial evidence of [a defendant]'s state of mind." United States v. Leake, 642 F.2d 715, 720 (4th Cir. 1981). A

9

statement "in which [a] decedent threaten[s]" a defendant charged with murder "bear[s] on the [defendant's] state of mind" and "[i]s . . . relevant in determining whether [a] killing was second degree murder, manslaughter, or self-defense." United States v. Cline, 570 F.2d 731, 734-35 (8th Cir. 1978). Testimony about such a threat, therefore, "[i]s non-hearsay and admissible." Id. at 735.

Appellant contested whether he possessed the state of mind necessary to commit second degree murder. "[T]he mental element of [18 U.S.C. § 1111 is] malice," United States v. Browner, 889 F.2d 549, 552 (5th Cir. 1989), and Appellant's closing argument is replete with suggestions that he did not act with malice. Indeed, Appellant's counsel went so far as to tell the jury, "what's going on in [Appellant's] mind is what's on trial here." J.A. 1063. Appellant conceded that he killed Harris, questioning only "whether the killing was second degree murder, manslaughter, or [defense of Andrews]." Cline, 570 F.2d at 734-35. He was thus entitled to present circumstantial evidence about his state of mind during the killing.

Osborne's testimony was undoubtedly relevant to Appellant's state of mind. To decide this case, the jury needed to determine whether Appellant reasonably believed Andrews was in imminent danger of serious bodily harm. See United States v. Oakie, 709 F.2d 506, 506 (8th Cir. 1983) (per curiam) ("As with

10

self-defense, so too with the defense of another, one is not justified in using force to protect the other unless he reasonably believes that the other is in immediate danger of unlawful bodily harm and that force is necessary to prevent that harm . . . ." (quoting W. LaFave & A. Scott, Handbook on Criminal Law § 54, at 398 (1972))). Evidence that Harris, within earshot of Appellant, explicitly threatened to stab Andrews quite obviously bears on the questions as to whether Appellant believed Andrews to be in imminent danger and whether that belief was reasonable.[2]

Osborne's testimony was thus relevant and was not hearsay. As the Government concedes, the district court should not have excluded it.

2.

But an erroneous evidentiary ruling does not entitle Appellant to his requested relief if the error was harmless. See United States v. Cloud, 680 F.3d 396, 401 (4th Cir. 2012). The Government does not concede this point. "[U]nder harmless error, the burden is on the Government to show that . . . an

---

[2] Cf. United States v. Matheny, 523 F. App'x 996, 998 (4th Cir. 2013) (per curiam) ("There was no evidence that either victim took any action that would have given Matheny any reasonable belief that he was in physical danger. Prior to Matheny pulling his weapon, neither victim threatened Matheny, made an aggressive movement, took an aggressive posture, or attacked him.").

11

error did not affect the defendant's substantial rights." United States v. Rodriguez, 433 F.3d 411, 416 (4th Cir. 2006) (emphasis omitted) (citing United States v. Olano, 507 U.S. 725, 734 (1993)).

Nonconstitutional errors are "harmless where we may say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" United States v. Cone, 714 F.3d 197, 219 (4th Cir. 2013) (quoting United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010)). "We have identified three decisive factors in making this determination: '(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case.'" United States v. Ibisevic, 675 F.3d 342, 350 (4th Cir. 2012) (quoting United States v. Ince, 21 F.3d 576, 583 (4th Cir. 1994)) (the "Ince factors"). The third factor is most important, see id. at 352, and "'involves assessing whether the . . . evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation' to the excluded testimony to ensure the error did not affect the outcome." Id. at 354 (quoting Ince, 21 F.3d at 584).

The first two Ince factors clearly weigh against harmlessness in this case. First, as discussed, Appellant's

12

state of mind was <u>the</u> central -- indeed the only vigorously disputed -- issue at his trial. Second, the district court did not mitigate the erroneous exclusion. Because the district court did not recognize its error, it did not give a curative instruction. And the court rebuffed Appellant's attempt to elicit Osborne's testimony through a compromise question.[3]

The Government relies on the ostensibly indisputable video evidence presented to the jury, the fact that other evidence establishing that Appellant thought Harris threatened Andrews was admitted, and the jury's brief deliberation coupled with its unequivocal verdict. We are not convinced the Government has carried its burden.

The video evidence was captured by surveillance cameras that do not record audio data. And when the evidence in question is a verbal threat, we think it goes without saying that a silent video is far from indisputable. A jury may view video of one person rushing at and stabbing another who grabs at his pocket while saying something innocuous as an ambush. The same jury may think the video shows a defensive stabbing if the ultimate decedent yells, "[I'm] going to slam a knife in somebody," J.A. 897, while grabbing at his pocket just before

---

[3] Appellant proposed asking Osborne, "Without saying what anyone said, did anyone make a threat towards anyone else?" J.A. 889. The court did not allow the question.

13

the fight breaks out. The import of the security camera footage -- and the extent to which it is inculpatory or exculpatory -- thus turns, to some degree, on the particular words Harris said to Andrews during the incident in question. Without sound, the video could not conclusively resolve the relevant and disputed question to which Osborne's testimony was directed: Did Harris threaten to kill Andrews?

The Government next points out that the district court did not exclude all evidence supporting Appellant's contention that such a threat occurred inasmuch as Osborne was permitted to testify that, immediately prior to the fight, he witnessed Harris "touching his pockets" and "motioning for [Appellant and Andrews] to come on." J.A. 891. The court further allowed Osborne to testify that in his opinion, as somebody who had spent time in prison and seen violent altercations, Harris's gestures were threatening. Moreover, Appellant, himself, was allowed to testify specifically about Harris's verbal threat.[4]

---

[4]    Q. . . . . What does [Harris] say to [Andrews]?
A. I'm going to stick this steel in your bitch ass.
Q. What does that mean?
A. Like he going to stab him up.
Q. With what?
A. With a -- with a knife. Steel means like knife -- shank.
Q. Did you see a knife -- homemade weapon?
(Continued)

14

Arguably, then, the jury heard evidence from which it could have concluded that Harris threatened to stab Andrews, yet the jury still found Appellant guilty of murder.

To be sure, "error [i]s harmless" when "the evidence [a party] sought to introduce [i]s cumulative, inasmuch as evidence [establishing the same facts] had already been admitted into evidence." United States v. Cioni, 649 F.3d 276, 287 (4th Cir. 2011). But testimony that "would have added a great deal of substance and credibility" to a proffered defense is "not . . . 'cumulative.'" Washington v. Smith, 219 F.3d 620, 634 (7th Cir. 2000). Not all evidence, in other words, is equal, and here, the admitted evidence about Harris's threat was no replacement for Osborne's excluded testimony.

Osborne's testimony would have provided specific and direct evidence supporting Appellant's contention that Harris threatened Andrews, and importantly, it would have constituted the only third-party corroboration of Appellant's contention that Harris's threat was explicit and verbalized. A "defense, discounted by the jury when standing alone, may have been

---

> A. No. But we [sic] knowing Harris, anything he say -- anytime he say he going to do something, he do it.

J.A. 952-53.

15

believed when bolstered by [corroborative] testimony." <u>United States v. Parry</u>, 649 F.2d 292, 296 (5th Cir. 1981); <u>see also</u> <u>Ibisevic</u>, 675 F.3d at 350 ("The jury could have credited the testimony of Ibisevic's witnesses that he generally had poor English skills yet discounted his stand-alone testimony that he misunderstood Officer Zayas in this particular matter. Because Rahima's excluded testimony was the <u>only</u> evidence that corroborated Ibisevic's claim that he believed he was truthfully answering questions as to the value of his checked luggage, her testimony was not cumulative."). We do not assume a jury will afford equal weight to a defendant's corroborated and uncorroborated testimony. <u>See</u> <u>Ibisevic</u>, 675 F.3d at 350. So we will not assume the sole third-party corroboration of a detail central to Appellant's self-defense argument would not have "added a great deal of substance and credibility" to his defense. <u>Washington</u>, 219 F.3d at 634. We cannot, therefore, say that allowing Appellant to tell the jury that Harris verbally threatened to stab Andrews rendered the erroneous exclusion of Osborne's corroboration of that fact harmless.

We also reject the Government's reliance upon the length of the jury's deliberative process in this case. We reject the invitation to attempt to read the tea leaves regarding what is a notoriously impenetrable process. The jury's relatively brief deliberation does not establish that the

16

Government's case was too overwhelming to be affected by the district court's error. It is true that a brief jury deliberation may evidence a categorical verdict. Cf. Ibisevic, 675 F.3d at 354. And it is true that Appellant's jury asked no questions and deliberated only one hour and fifteen minutes before rejecting his defenses. But given the impact of the excluded testimony here, we cannot say "with fair assurance" Cone, 714 F.3d at 219 (quoting Johnson, 617 F.3d at 292), that the jury would have viewed Appellant's defense in the same light had Osborne affirmed Appellant's claim that Harris threatened to stab Andrews moments before Appellant engaged in the fatal fight.

Because the concededly erroneous exclusion of Osborne's testimony affected the central issue at trial, was not mitigated, and left Appellant with only self-serving, uncorroborated testimony to support a fact material to his justification defense, it was not harmless.

B.

Appellant next argues that the district court erred by excluding his own testimony about his knowledge of Harris's past acts of violence. We agree that Appellant should have been allowed to testify about at least one of those acts.

17

1.

Appellant attempted to testify about two specific past acts of violence perpetrated by Harris -- the homicide for which Harris was incarcerated in the first place and a January 2007 incident at USP Hazelton during which Harris allegedly attacked another inmate with a knife. Appellant claimed his knowledge of these incidents colored his reaction when he saw Harris threatening Andrews on October 7, 2007, but the district court excluded the testimony pursuant to Federal Rule of Evidence 403.[5]

"[A] defendant claiming self defense may show his own state of mind by testifying that he knew of the victim's prior acts of violence," United States v. Saenz, 179 F.3d 686, 689 (9th Cir. 1999), but such testimony may nonetheless be "properly excluded pursuant to [Federal] Rule [of Evidence] 403." United States v. Milk, 447 F.3d 593, 600 (8th Cir. 2006). Rule 403 directs that evidence be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."[6]

---

[5] After one attempt to elicit this testimony, the court sustained a hearsay objection from the Government. That ruling is erroneous for the reasons discussed in Part II.A.1, supra. Circumstantial evidence offered to show a defendant's state of mind is not offered to prove the truth of any out of court assertion and is not hearsay. See Leake, 642 F.2d at 720.

[6] Federal Rule of Evidence 403 also provides that evidence should be excluded "if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting (Continued)

18

Fed. R. Evid. 403.  A court performing this balancing must weigh the marginal probative value of admission versus the marginal danger of admission in view of the entire record, including potential evidentiary alternatives.  See Old Chief v. United States, 519 U.S. 172, 183-85 (1997).  "Evidence is unfairly prejudicial . . . when there is a genuine risk that the emotions of a jury will be excited to irrational behavior . . . ." United States v. Siegel, 536 F.3d 306, 319 (4th Cir. 2008) (quoting United States v. Williams, 445 F.3d 724, 730 (4th Cir. 2006)).  But when "the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly."  United States v. Aramony, 88 F.3d 1369, 1378 (4th Cir. 1996).

a.

In this case, the exclusion of Appellant's testimony about his knowledge of Harris's homicide conviction was an appropriate exercise of the district court's discretion.  While the court excluded testimony specific to the homicide conviction, it allowed Appellant to testify generally that he

_____

cumulative evidence."  The district court, however, reasoned only that "the prejudice is obvious," J.A. 958, when excluding the testimony in question, so we focus our analysis on unfair prejudice.

19

was aware Harris had been involved in prior incidents of violence. This was a reasonable compromise. The court respected the "substantial probative value" of Appellant's knowledge that Harris had a history of violence while "s[eeking] to minimize any prejudice" from testimony painting the victim as a murderer. United States v. Myers, 280 F.3d 407, 414 (4th Cir. 2002). Appellant's knowledge that Harris had been convicted of homicide lent credence to his October 2007 reaction only in a general sense -- Appellant was aware Harris had been violent before, and he thought Harris might act violently again. Limiting that testimony to a general acknowledgment of Appellant's awareness makes sense.

b.

The details of the January 2007 incident, on the other hand, are infused with different and greater probative value. Such testimony would have provided insight bearing on the question as to whether Appellant's belief that Andrews's life was in danger was reasonable. Appellant intended to testify that Harris had previously attempted to stab another inmate in USP Hazelton -- just nine months prior to the incident in question. Knowledge of that incident constitutes knowledge that Harris carried a knife -- and would not hesitate to use it -- while in USP Hazelton. Those details precisely accord with what Appellant contends he reasonably feared on October 7, 2007 --

20

that Harris had a knife and intended to stab Andrews. Therefore, such testimony is unquestionably relevant to the determination as to whether it was reasonable to fear that Harris's threat would be carried out. Moreover, due to the specificity of the facts with respect to the January 2007 incident, such testimony is much more probative of Appellant's defense than mere awareness that Harris had a reputation for violence.

On the other side of the Rule 403 balance, the danger of unfair prejudice from the additional testimony was slight. The jury had already received substantial evidence suggesting that Harris was a violent criminal. Before Appellant ever took the stand, the jury learned that Harris was incarcerated at a maximum security institution, and the Government itself had elicited detailed testimony about the dangerousness of this particular prison's residents. For example, one of USP Hazelton's corrections officers testified, "A good portion of the inmates that are there are serving a good part of their life, to a life sentence." J.A. 480. He added, "USP Hazelton is a gang run yard," and its population is made up of inmates who have accrued a certain minimum criminal history score based on convictions for violent crimes or disciplinary infractions while in prison. Id. The Government also elicited testimony about USP Hazelton's robust security measures. Staff members

21

carry pepper spray. Observational towers are plentiful within the complex and around its perimeter. The exterior fence is electrified and lethal to the touch. This is all to say, the jury already knew that Harris was serving time in a prison reserved for dangerous persons. And as mentioned, Appellant was permitted to testify that Harris had a reputation for violence. After all of that, learning that Harris had tried to stab another inmate would not substantially increase the danger of unfair prejudice. See United States v. Obi, 239 F.3d 662, 668 (4th Cir. 2001) ("[T]he likelihood of additional prejudice to the jury [from learning a defendant had been incarcerated during a certain period of time] was slight[] [where] [t]he jury learned only [of] . . . an arrest about which they had already heard evidence . . . .").

Rather, a court "abuse[s] its discretion under Rule 403" by excluding evidence that "would not have painted [a victim] darker than he already must have appeared." United States v. James, 169 F.3d 1210, 1215 (9th Cir. 1999) (en banc). And we see no way to avoid that conclusion with respect to Appellant's testimony about the January 2007 incident. The testimony had substantial marginal probative value over and above the admitted testimony about Harris's dangerousness, but it raised little additional likelihood of unfair prejudice. When "evidence sought to be excluded under Rule 403 is . . .

22

probative, the balance . . . should be struck in favor of admissibility." Aramony, 88 F.3d at 1378. That balance should have been struck here.

2.

Having already concluded that the exclusion of Osborne's testimony was not harmless, there is no need to consider whether this second error would have been harmless in isolation. Both errors undermined the same aspect of Appellant's defense, and we have already concluded that remand is necessary to afford Appellant an adequate opportunity to present his case.

III.

Appellant next objects to the jury instructions given at his trial, or rather, the lack of a particular jury instruction. The district court refused to give Appellant's requested instruction on the doctrine of imperfect self-defense. "We review for abuse of discretion the district court's denial of . . . proposed jury instructions." United States v. Sonmez, 777 F.3d 684, 688 (4th Cir. 2015). We see no abuse of discretion in this regard.

Imperfect self-defense refers to a set of arguments that "operate[] to negate [the] malice" element of a murder charge while admitting that an unlawful killing occurred. Burch v. Corcoran, 273 F.3d 577, 587 n.10 (4th Cir. 2001) (applying

23

Maryland law) (quoting State v. Faulkner, 483 A.2d 759, 761 (Md. 1984)). "[S]uccessful invocation," therefore, "does not completely exonerate the defendant, but mitigates murder to . . . manslaughter." Id.

Assertions of imperfect self-defense typically fall into one of two categories: "(1) the defendant unreasonably but truly believed that deadly force was necessary to defend himself, or (2) the defendant inadvertently caused the victim's death while defending himself in a criminally negligent manner." United States v. Milk, 447 F.3d 593, 599 (8th Cir. 2006). If "the defendant intend[ed] to use deadly force [based on an] unreasonable belief that he [wa]s in danger of death or great bodily harm," the defendant can salvage only a voluntary manslaughter conviction, at best, from a rejected self-defense argument. United States v. Manuel, 706 F.2d 908, 915 (9th Cir. 1983). But an argument falling into the second of Milk's categories can justify an involuntary manslaughter verdict. A "defendant[, who] attempt[ed] to use non-deadly force, but d[id] so in a criminally negligent manner [resulting in] death," is entitled to "both involuntary manslaughter and self-defense instructions." Id.

Appellant, applying this doctrine to his argument that he acted in defense of Andrews, requested a jury instruction

24

appealing to the first of these categories. His proposed instruction read in relevant part:

> If the defendant actually believed that the person defended was in immediate and imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the defendant's actual, though unreasonable, belief is a partial defense of another person and you should find the defendant is guilty of voluntary manslaughter rather than murder.

J.A. 226. The district court did not give the requested instruction.

"In general, we 'defer to a district court's decision to withhold a defense . . . in a proposed jury instruction' in light of that court's 'superior position . . . to evaluate evidence and formulate the jury instruction.'" United States v. Powell, 680 F.3d 350, 356 (4th Cir. 2012) (quoting United States v. Gray, 47 F.3d 1359, 1368 (4th Cir. 1995)). Error in refusing to give such an instruction is reversible "only when the instruction '(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.'" United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009) (quoting United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995)).

25

But a "district court has no discretion to refuse to give a lesser-included instruction if the evidence warrants the instruction and the defendant requests it," United States v. Baker, 985 F.2d 1248, 1259 (4th Cir. 1993), and imperfect self-defense amounts to an argument that a defendant charged with murder is guilty of a lesser-included manslaughter offense, see Milk, 447 F.3d at 599; Burch, 273 F.3d at 587 n.10. Accordingly, where a defendant "assert[s] . . . an imperfect self-defense" rendering "malice aforethought . . . [a] disputed element," and where "a jury could rationally convict [the defendant] of . . . manslaughter and acquit him of second degree murder," a "district court err[s] in taking the mens rea issue from the jury by refusing to instruct on . . . manslaughter." United States v. Brown, 287 F.3d 965, 975, 977 (10th Cir. 2002).

Of course, the district court did not refuse to give a lesser-included instruction in this case. It granted Appellant's request to instruct the jury on voluntary manslaughter, and it informed the jury that, if the Government failed to prove malice aforethought, Appellant could be guilty of voluntary manslaughter but not second degree murder.

The court only declined to give Appellant's more specific instruction, which spelled out his imperfect self-defense argument. Establishing error here is more difficult. A "district court d[oes] not abuse its discretion" by refusing a

26

proposed instruction that was "clearly covered by the instructions given," United States v. Green, 599 F.3d 360, 378 (4th Cir. 2010), just because "a more specific instruction might have been desirable to" the defendant, id. (quoting United States v. Patterson, 150 F.3d 382, 388 (4th Cir. 1998)).  Here, Appellant points to no case that suggests his proposed instruction was anything more than a favorable elucidation of an adequately-covered defense.[7]

Numerous courts have held that a district court errs by withholding a manslaughter instruction when requested by a defendant raising imperfect self-defense to combat a § 1111 charge.[8]  See, e.g., United States v. Toledo, 739 F.3d 562, 569

---

[7] The Government argues that a defendant may not raise an imperfect self-defense argument when charged with violating 18 U.S.C. § 1111, and so Appellant's instruction did not accurately state the law.  Because the district court did not err regardless of whether the rejected instruction was accurate, we see no need to address the Government's arguments at this point.

[8] Our own circuit's law contains no precedent directly on point, but we did once address this question in an unpublished opinion.  See United States v. Battle, 865 F.2d 1260 (table), 1988 WL 138687 (4th Cir. 1988) (per curiam).  There, "[w]e f[ound] no reversible error" in the district court's refusal to give an imperfect self-defense instruction because "[t]he district judge adequately instructed the jury on both the required concept of malice and on the crime of manslaughter," thereby "adequately convey[ing] to the jury the law which supported [the defendant]'s theory of defense."  Id. at *3 (citing United States v. Dornhofer, 859 F.2d 1195, 1199 (4th Cir. 1988)); see also United States v. Drotleff, 497 F. App'x 357, 359 (4th Cir. 2012) (per curiam) ("A defendant, who intentionally uses deadly force in an effort to defend himself (Continued)

(10th Cir. 2014) ("The district court erred in denying an involuntary manslaughter instruction."); Brown, 287 F.3d at 977 ("The district court erred in taking the mens rea issue from the jury by refusing to instruct on involuntary manslaughter."); United States v. Anderson, 201 F.3d 1145, 1152 (9th Cir. 2000) ("An instruction on involuntary manslaughter was thus required, and it was error not to give the instruction."); United States v. Begay, 833 F.2d 900, 903 (10th Cir. 1987) ("[The defendant]'s testimony was sufficient to support the involuntary manslaughter instruction."). But Appellant does not point to, and we have not found, any cases reversing a district court that instructed the jury on manslaughter while refusing only a more specific instruction expounding imperfect self-defense. This makes sense. If error is committed when a court "tak[es] the mens rea issue from the jury" despite being in dispute through imperfect self-defense, Brown, 287 F.3d at 977, it is avoided by instructing on both mens rea and the lesser-included offenses that become relevant if mens rea is not proven.

This is precisely what the district court did here. It considered instructions on malice and manslaughter to be

but does not meet the requirements for self-defense, may commit voluntary . . . manslaughter." (citing Manuel, 706 F.2d at 915)).

28

sufficient, telling Appellant, "I believe you've got your instruction on voluntary manslaughter, which you're entitled to have, which you should have, but . . . [imperfect self-defense] only takes you to -- it's a segue or bridge to get you to voluntary manslaughter, which you've got an instruction on." J.A. 871. We are in agreement that these instructions were sufficient. And Appellant was able to present his defense inasmuch as he was permitted to argue that his testimony negated the Government's proof of malice as he saw fit. Thus, we see no abuse of discretion here.

IV.

For all of the foregoing reasons, Appellant's conviction is vacated, and this case is remanded for further proceedings consistent with this opinion.

VACATED AND REMANDED